## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES MUSTO, DMD, | : | Civil No. 3:21-CV-0966 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS SWEENEY, in his individual | : | |
| and official capacities, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

This case involves several *Bivens*[1] claims against individual IRS agents, common law malicious prosecution and intentional infliction of emotional distress claims, as well as claims brought against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* ("FTCA").  (Doc. 36.)  The matter that gives rise to this lawsuit occurred when Plaintiff Charles Musto, DMD ("Musto") underwent a civil audit by the IRS, which he alleges the Government transformed into a criminal investigation after he invoked his Fifth Amendment right to remain silent during the course of his audit.  (*Id.* ¶¶ 2–4.)

Before the court is Defendants' motion to dismiss, which seeks to dismiss the amended complaint in its entirety for failure to state a claim upon which relief

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (recognizing for the first time an implied private right of action for damages against federal officers alleged to have violated a citizen's constitutional rights).

can be granted and lack of subject matter jurisdiction.  (Doc. 42.)  For the reasons

set forth below, Defendants' motion will be granted.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Musto opened and began operating his dental practice in Forty Fort,

Pennsylvania in 1992.  (Doc. 1, ¶¶ 22–23.)  Having no prior business experience,

Musto engaged an accountant named Thomas Melone ("Melone") in 1992, who

advised Musto to structure his practice as a sole proprietorship.  (*Id.* ¶¶ 25–26.)

Initially, all transactions were tracked manually on paper.  (*Id.* ¶ 27.)  In the late

1990s, Musto purchased and implemented a dental practice management software

program called SoftDent to capture all business receipts.  (*Id.*)  SoftDent provided

the front-office employees with a platform to electronically track and generate

reports of dental procedures performed and insurance and customer payments, as

well as billing and collection.  (*Id.* ¶ 28.)  SoftDent tracked and documented all of

Musto's earned income.  (*Id.*)  Prior to purchasing SoftDent, Musto and Melone

met with a sales representative from SoftDent to discuss the software's

capabilities.  (*Id.* ¶ 29.)  The sales representative explained that SoftDent provided

the accountant with an easier, more efficient means of tracking daily, monthly, and

yearly transactions.  (*Id.*)  Melone later met with the SoftDent representative a

second time to further discuss the software's capabilities and benefits.  (*Id.*)

Musto himself did not receive training for SoftDent like his front office employees did, as they were entirely responsible for handling the bookkeeping and collections aspects of his dental practice. (*Id.* ¶¶ 30–31.) Musto's front office staff recorded all payments from patients, including cash payments, in the SoftDent system. (*Id.* ¶ 32.)

In or around 1995, Donna Kon ("Kon") approached Musto seeking employment and offering to engage in collection work for the dental practice, and Musto hired her. (*Id.* ¶ 34.) Over time, her job responsibilities increased, and Kon became the bookkeeper for Musto's dental practice (and later, for his real estate ventures). (*Id.* ¶ 35.) Kon also acted as Musto's personal assistant with respect to payment of outstanding invoices, including Musto's personal expenses such as his daughter's tuition payments. (*Id.* ¶ 36.) Musto expected Kon to properly account for such payments as personal, rather than business, expenses. (*Id.*)

Initially, prior to the implementation of SoftDent, Kon accounted for Musto's business receipts by tracking the deposits in Musto's business account. (*Id.* ¶ 37.) As Musto's practice grew and he implemented SoftDent, front office staff would print out daily SoftDent records and place a hard copy in a bin that Kon retrieved and was supposed to use to reconcile Musto's business receipts. (*Id.* ¶ 38.) Kon prepared and provided financial statements to Melone, which Musto

believed incorporated the daily SoftDent records from his front office staff. (*Id.* ¶ 40.)

In addition to his dental practice, beginning in approximately 1994, Musto began purchasing various properties, acquiring the properties as sole proprietorships at Melone's advice. (*Id.* ¶¶ 43–44.) After purchasing a property on Welles Street in Forty Fort, Pennsylvania, Musto created a separate corporate entity in which he could title subsequent properties. (*Id.* ¶ 46.) Eventually, Musto owned a portfolio of properties that he rented to primarily commercial tenants, with a handful of residential tenants as well. (*Id.* ¶ 47.)

In the 2005 time period, Musto entered into a "50/50" partnership with Kon's husband, Michael Kon, to purchase an entity known as Tom Hart Realty, a realty management company. (*Id.* ¶ 48.) As part of Musto and Michael Kon's business arrangement, Michael Kon ran the day-to-day business operations of Musto's rental properties and collected some (but not all) of the rental payments from Musto's tenants. (*Id.* ¶ 49.) Other tenants mailed their rent payments directly to Musto's dental office. (*Id.*) Musto was a silent partner in Tom Hart Realty and he relied upon Michael Kon to manage the day-to-day affairs of the business. (*Id.* ¶ 51.) All physical and electronic records pertaining to the rental properties were in the possession of Donna Kon and her husband at the Tom Hart Realty office. (*Id.*) Around the same time, Donna Kon became responsible for the accounting of

4

all income from Musto's rental properties in addition to her other responsibilities for Musto's dental practice. (*Id.* ¶ 52.) All of Musto's rental properties were reported on his tax returns. (*Id.* ¶ 53.) Most tenants made rental payments via check, and the general practice to account for the rental payments was to photocopy each check prior to its deposit and provide the photocopy to Kon, who entered the transaction into a Quickbooks ledger that she maintained. (*Id.* ¶ 54.)

On March 9, 2012, the Civil Examination Division of the IRS, by and through Defendant Thomas Sweeney ("Sweeney"), informed Musto that his 2010 personal tax return was subject to an audit. (*Id.* ¶ 55.) Upon learning of the audit, Musto contacted Melone, who advised that he could handle the audit on Musto's behalf. (*Id.* ¶ 56.) Melone told Musto that he would contact Sweeney, the IRS Examiner assigned to the matter, to schedule a meeting between the three of them. (*Id.* ¶ 57.) In preparation for the audit meeting, Musto discovered that Melone had not relied on any SoftDent reports to calculate the dental practice's income and instead only used bank deposit records that Donna Kon provided to him. (*Id.* ¶ 58.) Accordingly, Melone mistakenly relied upon and included only deposit records from the dental practice's original bank account at Citizen's Bank to calculate the dental practice's income when preparing Musto's tax returns. (*Id.* ¶ 59.) Thus, without the SoftDent reports and the deposit records from Musto's other bank accounts, Musto's income was underreported. (*Id.* ¶ 60.) At Melone's

instruction, Musto secured an extension to file that current year's tax return and terminated Melone's representation in connection with the audit.  (*Id.* ¶¶ 61–63.)

Musto then hired Lisa Lori ("Lori") and Mark Cedrone ("Cedrone") as counsel to help him navigate the audit process.  (*Id.* ¶ 64.)  In April 2012, as counsel for Musto, Lori and Cedrone met with Melone and Donna Kon separately to discuss the upcoming audit.  (*Id.* ¶ 65.)  Prior to these meetings, it came to Musto's attention that Donna Kon had mischaracterized certain checks for the dental practice and realty company in the Quickbook entries she maintained.  (*Id.* ¶ 66.)  After the meetings, Musto was instructed to have his books and records reviewed for any mistakes and to remedy them.  (*Id.* ¶ 67.)

In August 2012, Musto engaged a new accountant, Frank Pinnacoli ("Pinnacoli") to assist him with the audit.  (*Id.* ¶ 68.)  Upon Pinnacoli's advice, Musto paid approximately $500,000 to the IRS to satisfy any then-owed or future tax liability arising out of the bookkeeping errors discovered.  (*Id.* ¶ 69.)

At the time of Musto's audit, Sweeney had only been employed by the IRS for approximately two years.  (*Id.* ¶ 81.)  Sweeney was trained to search for indicators of fraud, known as "badges," and to prepare a criminal referral for a Fraud Technical Advisor to review and approve if badges were found.  (*Id.* ¶ 82.)  Musto asserts that no fraud badges associated with income omission were present

in Musto's case.  (*Id.* ¶¶ 82–84.)  Musto also contends that no fraud indicators relating to the conduct of a taxpayer were present in his case.  (*Id.* ¶ 85.)

At least twice, Musto attempted to explain to Sweeney, through counsel, that all of his income was properly documented in SoftDent, but that his bookkeeper and accountant mistakenly failed to transfer this data from SoftDent to his returns, resulting in the underreporting of his income.  (*Id.* ¶ 86.)  Sweeney declined to meet with Musto's counsel to further discuss the issue and wanted to speak directly with Musto.  (*Id.* ¶¶ 87–88.)  Based on his attorney's advice, Musto declined to participate in an interview with Sweeney, invoking his Fifth Amendment right to remain silent and to only communicate through counsel.  (*Id.* ¶¶ 89–90.)

In early March 2013, Sweeney made a referral report to the IRS Criminal Investigation Division stating that Musto should be subjected to criminal prosecution.  (*Id.* ¶ 95.)  On or about March 7, 2013, Defendant Alan Frevele ("Frevele"), a Fraud Technical Advisor with the IRS, discussed the case with Sweeney.  (*Id.* ¶¶ 82, 98.)  Frevele approved Sweeney's referral for criminal prosecution.  (*Id.* ¶ 98.)  Soon thereafter, Defendant Marie Grabinski ("Grabinski"), a Special Agent with the IRS, received the fraudulent referral report from Sweeney.  (*Id.* ¶ 101.)  On March 14, 2013, Grabinski met with Sweeney and Defendant Ben Wylam ("Wylam"), a Special Supervisory Agent with the IRS, to discuss Musto's case.  (*Id.* ¶ 102.)

Assistant United States Attorney Lorna Graham ("AUSA Graham") was initially assigned to the investigation. (*Id.* ¶ 99.) AUSA Graham was assigned to the criminal investigation for 18 months and did not pursue criminal charges against Musto. (*Id.* ¶ 100.)

In addition to the documents Sweeney gave to her, Grabinski gathered documents via subpoena from Musto's financial institutions, Donna Kon, and Melone. (*Id.* ¶ 104.) Throughout the process of gathering documents, Grabinski communicated and acted in concert with Wylam, her supervisor. (*Id.* ¶ 105.) From March 2013 through the date of Musto's superseding indictment on June 21, 2016, Grabinski and Wylam interviewed prospective witnesses together, which included Donna Kon and some of Musto's front-office staff, who advised Grabsinki and Wylam of the SoftDent program. (*Id.* ¶ 106.)

In the Spring of 2014, another attorney from the United States Attorney's Office, Joseph Terz ("AUSA Terz"), contacted Cedrone to notify him that the United States Attorney's Office was still pursuing a criminal investigation. (*Id.* ¶ 108.) On or around June 13, 2014, Musto's counsel met with AUSA Terz and explained that the underreporting of income was due to Musto's good faith reliance on Donna Kon, his longtime bookkeeper, and Melone. (*Id.* ¶ 109.) Musto's counsel further explained that all earned income had been captured by SoftDent, but Melone had inadvertently not used or consulted the SoftDent reports when

computing Musto's income for tax purposes.  (*Id.* ¶ 110.)  Following this meeting, AUSA Terz advised that the United States Attorney's Office decided not to prosecute the case against Musto because there was no evidence of willful omission of taxable income.  (*Id.* ¶ 111.)

Two years later, in March 2016, a representative of the United States Department of Justice, Tax Division, Criminal Section, contacted Musto's counsel to inform him that it would independently proceed with a criminal case against Musto for his 2009 tax return, not the 2010 return for which the audit took place. (*Id.* ¶ 112.)  Grabinski and Wylam interviewed Donna Kon a second time on March 24, 2016.  (*Id.* ¶ 113.)  The Government provided Kon with a proffer statement providing that if she testified, the Government would not prosecute her. (*Id.* ¶ 115.)

During Kon's testimony before the Grand Jury on March 29, 2016, no questions were asked relating to the SoftDent records.  (*Id.* ¶¶ 117–119.)  Kon was asked about the bank receipts she used and whether she believed that constituted the entirety of the business receipts for Musto's dental practice.  (*Id.* ¶ 118.) Additionally, Kon testified that she believes her statements and testimony have remained consistent throughout the multiple interviews, which Musto asserts is not accurate.  (*Id.* ¶¶ 120–121.)  Thus, Musto asserts that the Government suborned perjury from Kon in front of the Grand Jury.  (*Id.* ¶ 117.)

On April 2, 2016, Musto's counsel met with DOJ Tax Counsel and attempted to offer SoftDent reports that captures all income the dental practice received, but DOJ Tax Counsel declined.  (*Id.* ¶¶ 122–123.)  On April 12, 2016, Musto was formally indicted on one count of filing a false tax return in violation of 26 U.S.C. § 7206(1) for the year 2010.  (*Id.* ¶ 124.)  Musto contends that the indictment was not supported by probable cause because it was based on perjury and false evidence presented by the Government.  (*Id.*)

In later depositions in a civil action Musto filed against Donna Kon and her husband, Donna Kon testified that there were many inconsistencies between what she told Grabinski and what Grabinski ultimately used to secure Musto's indictment, including a statement Kon allegedly made to Grabinski about Musto having foreign accounts.  (*Id.* ¶¶ 127–128.)

On April 27, 2016, Grabinski submitted an affidavit in support of a search warrant application for properties associated with Musto.  (*Id.* ¶ 132.)  Portions of the affidavit alleged:

A. Musto and his wife failed to report income from their rental properties;

B. Bookkeeper, Kon, was advised by Musto to "bury expenses" and reclassify expenses;

C. Bookkeeper, Kon, advised Grabinski that she did not discuss any bookkeeping or accounting matters of Musto's with his accountant (Melone);

10

D.  Sweeney identified patient payments diverted to the Mustos' personal accounts;

E.  Bookkeeper, Kon, stated she never received any deposit information from Musto when he received rental payments personally.  As a result, bookkeeper, Kon, stated she never entered those rental payments into Quickbooks;

F.  Bookkeeper, Kon, stated that Musto received cash payment from a commercial tenant renting garage space.  Kon further stated she brought this to Musto's attention and he advised her that he had received the payments;

G.  Bookkeeper, Kon, stated that the Mustos did not report rental payments from the following properties: 921 Wyoming Ave, 1898 Wyoming Ave, the tenants above Tom Hart Realty and 413 Packer Ave;

H.  Bookkeeper, Kon, stated that personal expenses like the Mustos' children's automobile insurance, car payments, airplane hanger and pool expenses were expensed through the dental practice;

I.  "Partner One," later discovered to be Michael Kon, stated he supplied tenants with rental receipts when he occasionally accepted rent payments, but then turned them over to bookkeeper, Kon;

J.  "Partner One," later discovered to be Michael Kon, described Musto's large car collection;

K.  Grabinski alleged that the "only way to arrive at the true patient fees [from Musto's dental practice] would be from the SoftDent files located on the office computer system or from the reports that were by the front office employees and given to Musto on a daily and monthly basis";

L.  Grabinski alleged Musto must have kept track of the monies not being reported as he requested Melone to work up the tax consequences based on two income scenarios after the notice of a civil audit being pursued against him;

M. Grabinski included as fact that Musto's [sic] maintained an extensive car collection;

N. Grabinski included as fact that Musto is a licensed pilot who owned an airplane;

O. Grabinski included as fact that the Mustos had stock market activity and accounts in foreign countries;

P. Grabinski stated that Musto's wife assisted with the scheme to defraud the IRS; and

Q. The affidavit described Musto as having provided separate receipts of his business accounts to his bookkeeper and accountant, both of them were unknowingly assisting in his scheme to defraud the IRS.

(*Id.*, ¶ 133.)

In obtaining the search warrant(s), Grabinski did not disclose that "Partner One" was Michael Kon, who was, along with his wife, being accused of fraud and theft by the Mustos. (*Id.* ¶ 134.) Musto's uncle was the tenant at 413 Packer Avenue and Musto did not charge him any rent. (*Id.* ¶ 138.) As to the other tenant referenced in the affidavit, Musto alleges that the cash rent payments were made directly to Kon and her husband, whom he assumes stole the rent money. (*Id.* ¶ 139.) Kon later testified that she had no information on Musto having money in foreign accounts and never relayed this information to Grabinski. (*Id.* ¶ 140.)

Musto's criminal trial began on June 3, 2019. (*Id.* ¶ 142.) At trial, Musto explained that the underreporting of income was due to his reliance on his accountant and bookkeeper, who failed to document the income reported in

SoftDent to his tax return.  (*Id.* ¶ 143.)  At trial, Musto established that if SoftDent reports were considered and incorporated by Kon and Melone, there would have been no or minimal underreporting on his tax returns.  (*Id.* ¶ 144.)  The Government's expert testified that once taking into account the SoftDent records, there were no issues with the accounting.  (*Id.* ¶ 145.)  The trial concluded June 13, 2019, and Musto was found not guilty.  (*Id.* ¶ 7.)

Musto alleges that he did not willfully conceal his earned income and never had any knowledge, or reason to believe, that his reported income was incorrect. (*Id.* ¶¶ 72–73.)  Musto's business maintained accounting records via SoftDent that accurately reported all of his earned income.  (*Id.* ¶ 74.)  Because the dental practice was a sole proprietorship, Musto contends that he was permitted to deposit business receipts in personal or business checking accounts.  (*Id.* ¶ 76.)  At all relevant times, Musto implemented accounting and bookkeeping measures by hiring professionals and installing appropriate software to ensure that income was accurately tracked and reported.  (*Id.* ¶ 78.)

After his acquittal, Musto initiated this action by filing a complaint on May 27, 2021.  (Doc. 1.)  Defendants filed a motion to dismiss on October 25, 2021. Musto then filed an amended complaint on December 7, 2021.  (Doc. 36.)  The amended complaint is now the operative pleading in this case.

On January 11, 2022, the court approved Defendants' substitution of the United States as a party in place of Defendants Sweeney, Grabinski, Wylam, and Frevele (collectively, "the individual Defendants") with respect to the state law claims set forth in Counts IV and V of the Amended complaint, pursuant to 28 U.S.C. § 2679(d). (Doc. 41.) The same day, Defendants filed the instant motion to dismiss with an accompanying brief in support. (Docs. 42, 43.) Musto timely filed a brief in opposition on February 8, 2022. (Doc. 45.) Defendants then filed a reply brief on March 1, 2022. (Doc. 48.) With leave of the court, Musto filed a sur-reply brief on March 14, 2022. (Doc. 51.) Therefore, this motion is ripe for resolution.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States. In addition, this court has jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the Plaintiff and Defendants and Plaintiff asserts that the amount in controversy exceeds $75,000. The court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367. Further, venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).  The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension*

*Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Moreover, "documents whose contents are alleged in the complaint and whose

authenticity no party questions, but which are not physically attached to the

pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d

548, 560 (3d Cir. 2002); *see also U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d

382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider

matters extraneous to the pleadings, a document integral to or explicitly relied

upon in the complaint may be considered without converting the motion to dismiss

in one for summary judgment").   However, the court may not rely on other parts

of the record in determining a motion to dismiss, or when determining whether a

proposed amended complaint is futile because it fails to state a claim upon which

relief may be granted. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d

1250, 1261 (3d Cir. 1994).

## DISCUSSION

Musto's claims fall into two categories: (1) claims against the United States;

and (2) *Bivens* claims against the individual Defendants.  (Doc. 36.)  Each category

will be discussed in turn.

16

## A. Claims Against the United States – Counts IV, V, VII, and VIII[2]

The United States was substituted as the defendant for Counts IV and V of the complaint–common law malicious prosecution and common law intentional infliction of emotional distress–under 28 U.S.C. § 2679(d), and those claims were dismissed with respect to the individual defendants.  (Doc. 41.)  Counts VII and VIII are counts of malicious prosecution and Fifth Amendment retaliation, brought against the United States pursuant to the FTCA.  (Doc. 36, pp. 36–39.) [3]

First, Defendants argue that the four claims against the United States should be dismissed for failure to state a claim upon which relief can be granted and for lack of subject matter jurisdiction, as the United States has not waived sovereign immunity.  (Doc. 43, pp. 12–13.)  Defendants contend that Musto cites no statute in which the United States has consented to suits of this kind and that it has explicitly withheld its consent in the FTCA.  (*Id.* at 12.)  Additionally, Defendants argue that the FTCA claims would be barred in any event by Musto's failure to exhaust his administrative remedies.  (*Id.* at 13–15.)

Musto has provided no argument in opposition.  Rather, he seems to concede these points, as he explicitly notes that that "for purposes of responding to

---

[2] The seven counts in the complaint are labeled I, III, IV, V, VI, VII, and VIII.  (*See* Doc. 36.)  In Musto's brief in opposition to the motion to dismiss, he indicates that Count II has been withdrawn.  (Doc. 45, p. 4.)

[3] For ease of reference, the court utilizes the page numbers in the CM/ECF header.

Defendants' motion to dismiss, [Musto] will only address Defendants' arguments as to Counts I, III and VI." (Doc. 45, p. 4.)  Thus, the court finds that Musto does not oppose dismissal of the claims against the United States.  Indeed, absent a valid waiver, sovereign immunity shields the United States from suit.  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  The United States has not waived sovereign immunity for constitutional claims.  *United States v. Testan*, 424 U.S. 392, 400–02 (1976.) Therefore, the claims against the United States will be dismissed for lack of subject matter jurisdiction.

### B. Claims Against the Individual Defendants – Counts I, III, and VI
#### 1. Official Capacity

The claims against the individual Defendants are all *Bivens* claims.  "*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations."  *Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018). However, as discussed by Defendants, *Bivens* only authorizes suits against federal officials sued in their individual capacities, not in their official capacities.  *FDIC*, 510 U.S. at 485; *see also Hafer v. Melo*, 502 U.S. 21, 26 (1991).

The court first notes that Musto names all of the Defendants in both their individual and official capacities, but does not specify within each count of the complaint in which capacity he is attempting to sue the individual Defendants. (*See* Doc. 36, pp. 1, 29–32, 35–36.)  For this reason, Defendants argue at the outset

18

that to the extent Musto is bringing his *Bivens* claims against the individual

Defendants in their official capacities, the claims should be dismissed.  (Doc. 43, p.

15.)

Again, Musto offers no argument to the contrary, only asserting that he has

alleged viable *Bivens* claims "against the individual Defendants *in their individual*

*capacities*."  (Doc. 45, p. 2) (emphasis added).  Therefore, to the extent the *Bivens*

claims are being brought against the individual Defendants in their official

capacities, the claims will be dismissed with prejudice.

## 2.  Individual Capacity

In the case giving the *Bivens* doctrine its name, the Supreme Court held that

there is a cause of action for damages when a federal agent, acting under color of

his authority, conducts an unreasonable search and seizure in violation of the

Fourth Amendment.  *Bivens*, 403 U.S. at 397.  To date, the Supreme Court has

only recognized a *Bivens* remedy in the context of the Fourth, Fifth, and Eighth

Amendments.  *See Bivens*, 403 U.S. 388 (Fourth Amendment prohibition against

unreasonable searches and seizures); *Davis v. Passman*, 442 U.S. 228 (1979) (Fifth

Amendment gender-discrimination in the employment context); *Carlson v. Green*,

446 U.S. 14 (1980) (Eighth Amendment Cruel and Unusual Punishment Clause for

failure to provide an inmate adequate medical treatment).

The Supreme Court cautioned against expanding *Bivens* beyond the three established circumstances where it has formally acknowledged the availability of a *Bivens* remedy. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) ("[E]xpanding the *Bivens* remedy is now a disfavored judicial activity" and clarifying that "a *Bivens* remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress.") (internal citation and quotation marks omitted).

Post-*Ziglar*, courts must apply a two-part test to determine whether a claim for relief expands the *Bivens* remedy to a new context or category of defendants. *Id.* at 1849. First, a court must determine if the *Bivens* claim presents a new context. *Mack v. Yost,* 968 F.3d 311, 317 (3d Cir. 2020). The context is new if it is different in a "meaningful" way from the three established *Bivens* cases. *Ziglar*, 137 S. Ct. at 1849. "Meaningful" differences can be based on:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60; *see also Mack,* 968 F.3d at 320 ("[T]he 'proper test' for determining whether a case presents a new *Bivens* context is if the Supreme Court has not previously recognized a claim in that context. A context is 'new' if it

implicates a constitutional right not previously recognized by the Supreme Court.")
(internal citations omitted).  Second, if the case presents a new context, the court
must consider whether "special factors counselling hesitation" against extending
*Bivens* into this area exist "in the absence of affirmative action by Congress."  *Id.*
at 1857.  "[T]he inquiry must concentrate on whether the Judiciary is well suited,
absent congressional action or instruction, to consider and weigh the costs and
benefits of allowing a damages action to proceed."  *Id.* at 1858.  "[I]f there are
sound reasons to think Congress might doubt the efficacy or necessity of a
damages remedy," then the Judiciary should defer and allow Congress to play its
proper role.  *Id.* at 1858.

        This analysis requires the court to assess the impact on governmental
operations system-wide, including the burdens on government employees who are
sued personally, as well as the projected cost and consequences to the government
itself.  *Id.*  Additionally, "the existence of alternative remedies usually precludes a
court from authorizing a *Bivens* action."  *Id.*, 137 S. Ct. at 1865.

        The threshold question in this matter is whether Musto's claims present a
new context for *Bivens* actions or whether allowing the claims to proceed would
involve expanding *Bivens* in a meaningful way.  On this point, the parties disagree.
Defendants argue that on their face, the three *Bivens* claims asserted in this

action—malicious prosecution under the Fourth Amendment[4] at Count I;

conspiracy to violate Musto's civil rights pursuant to the Fourth, Fifth, and

Fourteenth Amendments at Count III; and Fifth Amendment retaliation at Count

VI—present new contexts.  (Doc. 43, pp. 17–18.)

    In contrast, Musto contends that none of his three *Bivens* claims present new

contexts.  As to the Fourth Amendment malicious prosecution claim, Musto asserts

that "[t]he courts of this Circuit have already conducted this analysis and have

provided a *Bivens* remedy against federal law enforcement officers for malicious

prosecution in violation of the Fourth Amendment."  (Doc. 45, p. 12.)  Musto also

asserts that "[t]his case concerns allegations of federal law enforcement officers

(here IRS law enforcement officers) violating Musto's Fourth Amendment rights

in the context of a malicious prosecution claim, conduct which many Federal

Courts, including those in this District, have found to fall within *Biven*'s intended

ambit."  (*Id.* p. 17.)

    Despite Musto's confident assertions, he has failed to cite any case law to

support the proposition that any courts, let alone courts within this District or

Circuit, have allowed a *Bivens* claim for malicious prosecution under the Fourth

Amendment to proceed.   Post–*Ziglar*, the Third Circuit Court of Appeals has held

---

[4] Count I of the complaint raises a claim for malicious prosecution pursuant to the Fourth, Fifth, and Fourteenth Amendments.  Defendants argue that if it exists at all, a constitutional right to be free from malicious prosecution exists only under the Fourth Amendment.  (Doc. 43, p. 23.)

that the "recognition of a cause of action under a constitutional amendment does not mean that such an action can vindicate every violation of the rights afforded by that particular amendment." *Vanderklok v. United States* 868 F.3d 189, 199 (3d Cir. 2017). That is the case here. Musto's complaint raises *Bivens* claims under both the Fourth and Fifth Amendments, but they are not the same as those raised in *Bivens* for an unreasonable search or seizure or *Davis* for gender discrimination. Therefore, both of these claims, in addition to the civil conspiracy *Bivens* claim, clearly present meaningfully different *Bivens* contexts.

The court must now consider whether there are "special factors counselling hesitation" against extending *Bivens* into these areas. Defendants argue that there several remedial structures in place that collectively counsel hesitation in expanding a *Bivens* action in the IRS context: 26 U.S.C. § 7433 (allows a taxpayer to bring a civil action for damages against IRS employees in connection with any collection activity); the Treasurer Inspector General for Tax Administration (an entity separate from the IRS, with responsibility for investigating misconduct by IRS employees); the "Taxpayer Bill of Rights" (provides for the termination of any IRS employee for violation the Internal Revenue Code or any IRS policies "for the purpose of retaliating against, or harassing, a taxpayer or taxpayer representative); and the FTCA (provides a mechanism to deal with torts committed by federal

employees acting within the scope of their employment).  (Doc. 43, pp. 19–20.)[5]
In response, Musto distinguishes the cases cited by Defendants and notes that the
existence of an FTCA remedy does not itself foreclose an analogous remedy under
*Bivens*.  (Doc. 51, p. 3.)

While it is true that the availability of an FTCA remedy does not, on its own,
foreclose a *Bivens* remedy, the Supreme Court's hesitance to extend *Bivens* is
especially apparent in cases involving complex statutory schemes in which
Congress has considered and created meaningful avenues for redress.  *See Bush v.
Lucas*, 462 U.S. 367, 368 (1983) (refusing to find an implied *Bivens* remedy for
federal employees alleging that supervisors violated their First Amendment rights
because the claims arose out of a "relationship . . . governed by comprehensive
procedural and substantive provisions giving meaningful remedies against the
United States"); *see also Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988)
(declining to find an implied *Bivens* remedy for claimants whose Social Security
disability benefits had been improperly terminated given the "elaborate remedial
scheme devised by Congress" to deal with the improper denial or termination of
disability benefits).  The Court has clarified that

---

[5] Defendants argue that alternatively, the individual Defendants are entitled to qualified
immunity from the *Bivens* claims against them.  (Doc. 43, pp. 21–24.)  Because the court finds
that the availability of a Bivens remedy is dispositive, it need not address the qualified immunity
arguments.

the concept of "special factors counseling hesitation in the absence of affirmative action by Congress" has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent. When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies.

*Schweiker*, 487 U.S. at 423. This is true even if Congress has failed to provide for "complete relief," because the existence of such a statutory scheme demonstrates that Congress provided some "meaningful safeguards or remedies." *Id.* at 425.

It is clear that Congress has provided meaningful safeguards or remedies for aggrieved taxpayers to bring complaints against IRS agents who may have wronged them. Although the statutory schemes may not provide for complete relief, it is apparent that there has been affirmative action by Congress in this area. In light of this special factor counseling hesitation, the court will not extend the *Bivens* remedy to these new contexts, and Musto's claims will be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the court concludes that the *Bivens* claims against the individual Defendants present new contexts and that a special factor counsels against extending the *Bivens* remedy to these new contexts. Additionally, the court concludes that it does not have jurisdiction over the claims against the United States because the United States has not waived its immunity. Therefore, the court

will grant Defendants' motion to dismiss.  (Doc. 42.)  Plaintiff will not be

permitted to amend his complaint, as any curative action would be futile.  An

appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 26, 2022